IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

KEVIN TYRONE DEMINGS,                    )    No. C 04-2635 SBA
                                         )
                  Petitioner,            )    **ORDER**
v.                                       )
                                         )
JAMES SCHOMIG, Warden,                   )
                                         )
                  Respondent.            )
_____    )

## INTRODUCTION

This matter comes before the Court on Kevin Tyrone Demings' (hereinafter "Petitioner") petition for a writ of habeas corpus under 28 U.S.C. § 2254.  For the reasons discussed below, the petition is DENIED.

## BACKGROUND

### I.    Procedural History

On June 7, 1999, after a jury trial, Petitioner was convicted in Contra Costa County Superior Court of one count of kidnapping for robbery, one count of kidnapping for carjacking, one count of carjacking, two counts of robbery, and one count of false imprisonment by violence, along with firearm enhancements and a prior strike conviction.  On November 4, 1999, Petitioner was sentenced to thirty-five years in state prison, followed by a consecutive term of life with the possibility of parole after fourteen years.  On February 15, 2002, the California Court of Appeal affirmed Petitioner's convictions and sentence.  On May 1, 2002, the California Supreme Court denied his petition for review.

On July 23, 2003, Petitioner filed a petition for writ of habeas corpus in the Contra Costa County Superior Court, which was denied on September 4, 2003.  On September 5, 2003, Petitioner filed a petition for a writ of habeas corpus in the California Court of Appeals, which was denied on October 2, 2003.  On October 7, 2003, Petitioner filed a petition for a writ of habeas corpus in the California Supreme Court, which was denied on June 30, 2004.

On June 30, 2004, Petitioner filed this federal habeas petition, in which he asserts violations of the Fifth, Sixth, and Fourteenth Amendments.

On October 4, 2004, this Court issued an Order to Show Cause directing Respondent to file an answer. (Docket No. 3)  On February 3, 2005, Respondent filed an Answer (Docket No. 9), and on April 6, 2005, Petitioner filed a Traverse (Docket No. 16), a Request for Judicial Notice (Docket No. 18), and a Reply (Docket No. 24).

Additionally, on April 6, 2005, Respondent filed a Motion for an Evidentiary Hearing. (Docket No. 17), which was denied without prejudice on February 28, 2006 (Docket No. 32).

The matter has been fully briefed and is now ready for review on the merits.

## II.   **Factual Background**

The California Court of Appeal summarized the facts as follows.[1]

### *The Kidnapping, Robbery, and False Imprisonment of Michelle Avalos (Counts 1-4, Demings and Irvin)*

The convictions were based upon two separate but related incidents that began with the abduction of Michelle Avalos in her dark purple or black Mustang convertible on the afternoon of June 25, 1998. As she was driving, Avalos observed "two Black males" in a "turquoise-colored car" she thought was a Ford Escort pass her Mustang and make an obvious effort to "turn and look" at her. After Avalos parked in front of the Baskin-Robbins store at the Coddington Mall in Santa Rosa, the turquoise car "parked right behind" her. As Avalos got out of the Mustang and walked past the front of her car, the passenger in the Escort, whom she identified at trial as Irvin, approached from behind, placed a gun in her lower back, and warned her not to scream or move "or he'd shoot" her. Irvin declined to take Avalos's purse or car keys as she offered, and instead directed Avalos to "get in the car." Avalos was reluctant, so Irvin placed his hand on her shoulder and repeated, "Just get in the car." When Avalos pleaded with Irvin, "Please take the car," he pushed her into the driver's seat of the Mustang and said, "No. Get in and drive." Irvin then climbed into the passenger seat next to Avalos.

As ordered by Irvin, Avalos followed the turquoise car to the second level of the garage at the Plaza Mall in Santa Rosa. She parked next to the turquoise car in an unoccupied area of the parking garage. The driver of the turquoise car, identified by Avalos as Demings, "walked up" and told her to "pop the trunk." The car trunk would not open, so Demings took some clothes from the turquoise car, tossed them in the back of the Mustang, and told Avalos to "get

---

[1]       The California Court of Appeal decision is the "last reasoned decision" of the state court, so the Court will apply the standards of § 2254(d) to that decision. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

in the back seat." Demings then drove the Mustang out of the parking garage, with Irvin still in the front passenger seat. He experienced difficulty with the stick shift and repeatedly stalled the car.

As they came to a stop sign at the bottom level of the garage, a woman driving a white car pulled close behind them. From the back seat, Avalos looked at the woman and twice "mouthed" that she "needed help." Rachel Sullen testified that as she left the plaza parking garage she saw a "Hispanic" woman she later identified as Avalos in the rear seat of a convertible Mustang. Avalos "kept turning and looking" at Sullen while mouthing the words, "Help me." Two "Black" men were in the front seat of the Mustang, "laughing as they were stalling the car." Sullen went directly home, and called the police to report what she had seen.

Meanwhile, Demings drove the Mustang onto the 101 freeway toward Petaluma. Avalos continued to try to attract the attention of passing motorists, until Demings apparently noticed and proclaimed that he "didn't trust" her. Demings pulled over onto the shoulder and directed Avalos to drive. He got into the rear seat, and warned Avalos to "drive the speed limit." When Avalos saw a police officer she swerved the Mustang, "hoping that he'd pull the car over." Demings warned Avalos that if she "got the car pulled over, that he wasn't going to go back to jail for nothing," and "was going to shoot" her, "so he had a reason to go to prison." While Avalos was driving, Demings took $200 in cash from her purse and "split it" with Irvin.

Avalos left the freeway as she was told by Demings. When she arrived at a stop light Avalos "peeled out" to try to get attention. Demings then ordered Avalos to pull to the side of the road and "get in the passenger side," so he could drive. Irvin moved to the back. At least two hours after they left Santa Rosa, Demings stopped briefly at a park to use a restroom; Avalos and Irvin remained in the car. While Demings was gone, Irvin warned Avalos that if she failed "to do as his friend. . . says," Demings "would actually kill" her.

When Demings returned, he said Avalos "knew too much," and they "should get rid" of her by throwing her in the water. Avalos protested that she "didn't know how to swim." Demings told her by the time she "hit the water, it's not going to make difference." Irvin and Demings also threatened to leave Avalos somewhere "to get raped by some of their friends."

They proceeded to an apartment complex, where Irvin went inside and returned with a woman who said "she wanted money" to detain Avalos "there at the apartment until they did whatever they had to do." Demings refused to pay the woman, and they left. Demings drove the Mustang to a liquor store to purchase cigarettes, then to a gas station. Irvin escorted Avalos to a restroom while Demings pumped gas. Avalos tried to attract the attention of the gas station attendant, but he was "looking the other way."

They finally arrived at a location in Richmond unknown to Avalos, where Demings and Irvin apparently arranged for her to remain in the garage of a residence while they "had to go out and do something." She was told to sit in a chair. A man who was fixing a car in the driveway agreed to watch her while Demings and Irvin were gone. After Irvin "pulled out" a white sweatshirt, he and Demings left in the Mustang, with Demings driving. Avalos was warned that if she left the garage she would "be killed or harmed."

Avalos remained the partially closed garage for about an hour. She noticed "a lot of people out there" in the front of the residence. She asked a little girl to use a telephone. The girl walked Avalos into the house, where a woman inside gave her a telephone. Avalos immediately called 911, and asked the operator for help. She then returned to the garage. When police officers arrived ten minutes later, everyone outside "just ran." Avalos took the opportunity to open the door, leave the garage, and dash to the officers. Avalos appeared to be frightened and disoriented. After a few moments, she told the officers that she "was the one that had called 911," and had been taken from Santa Rosa at about 3:00 p.m.

**The Robbery and False Imprisonment of Olivia Morales at Jack-in-the-Box (Counts 5-6, Demings Only)**

At around 7:00 the same evening, Olivia Morales was working at the drive-through cashier window at the Jack-in-the-Box restaurant on San Pablo Avenue in El Cerrito, when two men entered the restaurant. One of the men, identified by Morales at trial as Demings, "jumped over the register" and put a gun to her head. Demings told Morales, "let's go upstairs" to the office. Morales and another employee accompanied Demings upstairs; the other man waited downstairs. Demings ordered Morales to open the safe or he would kill her. She eventually managed to open the combination safe, and put the money from it into a black and white bag as Demings directed. They "went back downstairs" where Demings removed money from the cash register drawers. Both men then ran out of the restaurant to a black convertible Mustang parked outside. Once the men left, Morales called 911 to report the robbery. Two other employees who were present during the robbery were unable to make an identification of Demings, although one of the employees "tentatively identified" Irvin in a photographic lineup as the man who remained downstairs during the robbery.

**The Apprehension and Identification of Appellants**

At 7:19 that night, Richmond Police Officer Amy Bublak received the report of the robbery at the Jack-in-the-Box on San Pablo Avenue. She was nearby and proceeded to Highway 80 and Carlson, the location to which, according to the robbery report, a black Mustang used by the "two Black male suspects" was traveling. At the Carlson off-ramp, Bublak observed a "black Mustang which was driving erratically." She activated her emergency lights and siren, and broadcast the location of the black Mustang. Bublak lost sight of the Mustang momentarily, then saw it pull to the east side of the freeway, away from the center divide. Two "Black males" left the vehicle and began running up the embankment. Bublak parked directly behind the Mustang and began a foot pursuit of the suspects. The driver of the Mustang ran up the embankment and jumped over a sound wall. The passenger, Demings, was closer to her, so Bublak chased and eventually captured him with the assistance of another officer.

The police arrived at the Jack-in-the-Box 10 minutes after Morales's report of the robbery, and asked her to accompany them to the Carlson off-ramp of Highway 80 to view a suspect. When Morales arrived at the scene of the detention of Demings, she was told by the officers that "it might or might not be the person that robbed [her]." Morales approached to within five or six feet of Demings, who was handcuffed, and immediately recognized him as the man

4

United States District Court

For the Northern District of California

who put a gun to her head. Morales also identified two items found at the scene: a loaded .380-caliber semi-automatic chrome handgun used by Demings in the robbery, which was located behind the abandoned Mustang; and the black bag containing $475 taken from the Jack-in-the-Box safe, which was inside the car. The Mustang was the same one Avalos had been driving before she was accosted, although it had suffered damage to the left front fender and tire.

Irvin was apprehended after Avalos, who was speaking with the responding officers in the front yard of the residence to who she had been taken by appellants, pointed to a passing vehicle and exclaimed that one of the men who "kidnapped her out of Santa Rosa was in that car." Two other officers pursued the car and detained if a few blocks away. Avalos was transported to the detained vehicle, and instructed by one of the officers, "take a look at the occupants that were standing next to the car and advise me if one of them were, in fact, her assailant." She was also told that "it may or may not be the guy" who kidnapped her. Avalos made a positive identification of Irvin after noticing a distinctive tattoo she had seen.

Thirteen latent fingerprints were taken from the Mustang; three were matched to Irvin, but none were matched to Demings. No matching fingerprints were found inside the Jack-in-the-Box restaurant or on the recovered handgun. A turquoise Ford Escort that was found on the second level of the parking garage at Santa Rosa Plaza was registered to "Bradley Tyrone Demings."

The day after the robbery, six photographs were exhibited to Morales. She was given the standard admonition that the suspect may or may not be among the group of photographs. She identified Demings's photograph as "the one that robbed" her. In October of 1998, Morales attended a physical lineup, at which she marked two people, one of them Demings, as the robber. Her identification at the physical lineup "wasn't too sure," since two of the subjects were similar in appearance, and Demings's hair was longer than it had been when the robbery occurred. Morales testified at trial, however, that her identification of Demings was certain.

### The Defense Evidence

Demings testified in his defense that on June 25, 1998, he accompanied his friend Irvin from Vallejo to Santa Rosa. According to Demings's testimony on recross-examination, Irvin wanted to come to Santa Rosa to "try to find him a girlfriend up there. Somebody he can hit on, speak to, get at, meet. He wanted to meet a woman up there." In Demings's Ford Escort, he and Irvin went to his "wife's job," where they joined her for Demings testified that he knew James, but not his last name. lunch, then to the Santa Rosa Mall, and the Coddington Mall, at which they encountered Avalos as they were returning to the car. Irvin engaged in a conversation with Avalos while Demings waited in his car. Irvin and Avalos then stated they "they wanted to kick it and get some weed." They decided to go to Richmond in Avalos's Mustang to purchase marijuana and leave Demings's car on the shaded second level of the parking garage. Demings took his gray sweatpants and white sweatshirt from his car for the trip. Demings testified that neither he nor Irvin had a gun.

They traveled to Richmond, making a stop to use the restroom at Point Molate. In Richmond, they visited the home of Irvin's girlfriend, Selena. She wanted

United States District Court

For the Northern District of California

them to pay for marijuana, but Demings refused. Irvin purchased cigarettes at a nearby store, and beer, soda, and gas at a gas station, where Avalos also used a rest room across the street. Thereafter, they got back on the freeway, headed for Point Pinole. On the freeway, they encountered a friend, Keith Carson.

At Point Pinole, they drank beer before proceeding to an apartment near the BART station for Irvin to "check on some weed, marijuana." While Avalos and Irvin went inside, Demings walked to the store to buy another beer. As he was walking back to the car, Irvin and his friend James "pulled up" in the Mustang and told Demings to "jump in." Irvin, who was driving, said that Avalos had remained behind in the apartment.

Irvin, Demings and James drove to "some apartments" near Carlson Avenue. James made an unsuccessful attempt to purchase marijuana there, and returned to the car. They "ended up at the Jack-in-the-Box" on San Pablo Avenue, where James said his girlfriend worked, to "get some food." Demings stayed in the back seat to finish his beer while Irvin and James went inside. A few minutes later, James and Irvin ran "out the back door" of the Jack-in-the-Box, with James carrying a black duffle bag.

Again with Irvin driving, they went down Carlson to Central. Demings asked Irvin "what was going on," and Irvin replied that "he didn't know." Demings testified that he was unaware Irvin and James had just robbed the Jack-in-the-Box. However, as Irvin was driving he told Demings that while he and James were in the Jack-in-the-Box, suddenly "the dude just jumped over the counter."

On Central, they heard a police siren, and Irvin got on the crowded freeway and into the emergency lane. Demings asked Irvin to exit the freeway so he could "get out of the car." On the Carlson off-ramp, Irvin collided with a truck. He drove back onto the freeway, but the Mustang was "wobbling" and could go no further. The car came to rest in the emergency lane, where upon Irvin and James "jumped out and ran up the hill." Demings was still in the back seat when he saw a police car approach from behind. The officer "started running up the hill" after Irvin and James. Demings then left the Mustang and began to walk back toward the location of the collision with the truck. An officer pulled up and told him to lay "on the ground." Demings was then handcuffed and placed in a patrol vehicle.

Demings denied that he kidnapped or robbed Avalos, or carjacked her Mustang. He also denied that he participated in the Jack-in-the-Box robbery. He admitted that he lied in statements to the police after his arrest by failing to implicate Irvin in the Jack-in-the-Box robbery. He also lied to the police when he declined to identify photographs of James Benson as the man who accompanied Irvin into the Jack-in-the-Box.[2]

Keith Carlson testified that he and Demings are "good friends." On June 25, 1998, while traveling southbound on the I-80 freeway near Rodeo, he saw appellant driving a black convertible Mustang, with a Latino woman in the front passenger seat and a Black man in the rear seat. The woman did not look frightened or angry. Irvin did not testify or present any evidence. His counsel conceded that Irvin participated in the forcible abduction of Avalos, a

---

[2]Demings testified that he knew James, but not his last name.

carjacking and a robbery, but argued that he did not commit the kidnapping to facilitate a carjacking or robbery, and did not share Demings's intent. Defense counsel asserted that the evidence showed Irvin "tried to save" Avalos once she was kidnapped. (Exhibit 4 at 2-8, footnote in original).

## **LEGAL STANDARD**

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may grant a habeas petition only if the state court's adjudication of a claim on the merits: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than deciding the claim on the basis of a procedural rule. *Barker v. Fleming*, 423 F.3d 1085, 1092 (9th Cir. 2005); *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).

### A.    Clearly Established Supreme Court Law

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412 (2000); *Barker*, 423 F.3d at 1093. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003). If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law. *See Stevenson v. Lewis*, 384 F.3d 1069, 1071 (9th Cir. 2004).

The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether constitutional rights were violated "obviates neither the clarity of the rule nor the extent to

7

which the rule must be seen as 'established'" by the Supreme Court. *Williams*, 529 U.S. at 391 (referring to case-by-case analysis applicable to ineffective assistance of counsel claims); *see, e.g., Jackson v. Giurbino*, 364 F.3d 1002, 1009 (9th Cir. 2004) (Supreme Court's "unwavering fidelity" to its basic holding underscores that *Miranda v. Arizona*, 384 U.S. 436 (1966), is clearly established federal law). There are, however, areas in which the Supreme Court has not established a clear or consistent path for courts to follow in determining whether a particular event violates a constitutional right; in such an area, it may be that only the general principle can be regarded as "clearly established." *Lockyer*, 538 U.S. at 64-65. When only the general principle is clearly established, it is the only law amenable to the "contrary to" or "unreasonable application of" framework. *See Lockyer*, 538 U.S. at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." *Clark v. Murphy*, 331 F.3d 1062, 1070-71 (9th Cir.), *cert. denied*, 540 U.S. 968 (2003); *Duhaime v. Ducharme*, 200 F.3d 597, 600 (9th Cir. 1999).

**B.    "Contrary To"**

While the "contrary to" and "unreasonable application" clauses have independent meaning, *see Williams*, 529 U.S. at 404-05, they often overlap. *See Van Tran v. Lindsey*, 212 F.3d 1143, 1149-50 (9th Cir. 2000), *overruled on other grounds*, *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. *See also Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

A "run-of-the-mill state-court decision" that correctly identifies the controlling Supreme Court framework and applies it to the facts of a prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406. Such a case should be analyzed under the "unreasonable application" prong of § 2254(d). *See Weighall v. Middle*, 215

F.3d 1058, 1062 (9th Cir. 2000).

###### C.   "Unreasonable Application"

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 412-13; *see also Brown v. Payton*, 544 U.S. 133, 141-43 (2005).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *accord Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

The objectively unreasonable standard is not a clear error standard.  *Lockyer*, 538 U. S. at 75-76 (rejecting use of "clear error" standard).  After *Lockyer*, "[t]he writ may not issue simply because, in [the federal court's] determination, a state court's application of federal law was erroneous, clearly or otherwise. While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them." *Clark*, 331 F.3d at 1068.  Deciding whether the state court decision was unreasonable may require analysis of the state court's method as well as its result.  *Nunes v. Mueller*, 350 F.3d 1045, 1054 (9th Cir. 2003).

Finally, habeas relief is warranted only if the constitutional error at issue is a structural error or had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

## DISCUSSION

Petitioner raises five claims for relief under § 2254: (1) that the denial of his motion for severance of his trial violated his due process right to a fair trial under the Fifth and Fourteenth

9

Amendments, and his Sixth Amendment right of confrontation; (2) that admission of allegedly racially inflammatory testimony over defense objections at trial violated his due process right to a fair trial under the Fifth and Fourteenth Amendments; (3) that allegedly impermissible use of a field show-up identification violated his right to due process under the Fifth and Fourteenth Amendments; (4) that he received ineffective assistance of trial counsel; and (5) that the cumulative effect of all these errors deprived Petitioner of due process of law under the Fifth and Fourteenth Amendments.  Pet. at 3-4.

## I.   **Denial of Motion for Severance**

Petitioner claims that the trial court violated his right to a fair trial and his right to confrontation by denying his motion for severance, thus forcing him to go to trial with a co-defendant whose defense was to admit guilt and accuse Petitioner of being the lead actor.

### A.   **Background**

Petitioner made a pre-trial motion to sever his trial from his co-defendant pursuant to California Penal Code section 1098.  The motion was based on the fact that his co-defendant, Irvin, had made a statement to the police that potentially incriminated Petitioner.  He argued for severance based upon the rule of *Bruton v. United States*, 391 U.S. 123 (1969).  Ex. 1 - Clerk's Tr. at 322-23.

Irvin also made a pre-trial motion to sever, wherein he argued that he and Petitioner would have potentially conflicting and antagonistic defenses to the carjacking and kidnapping charges.  Petitioner planned to testify that entire encounter was consensual, and Irvin planned to testify that it was Petitioner who intended to rob and carjack the victim.  Ex. 1 - Clerk's Tr. at 413-14.  Irvin claimed that he did not intend a carjacking or robbery when the kidnapping occurred, and that he attempted to protect Avalos from harm by Petitioner.  Ex. 4 at 11.  Additionally, Irvin contended that he would be unduly prejudiced by association with Petitioner, and that there was inherent danger that a jury would be unable, even with proper instructions, to keep the evidence separated as to each defendant and each count.  Ex. 1 - Clerk's Tr. at 416.  Petitioner's counsel joined Irvin's counsel's concerns about conflicting defenses.  Ex.

**United States District Court**
For the Northern District of California

2 - Rep. Tr. at 34-35.  In response to Irvin's motion, the prosecutor indicated that he did not intend to use the defendants' statements to the police in his case-in-chief.  Ex. 1 - Clerk's Tr. at 442.

On May 24, 1999, the trial court held a hearing on the motion to sever.  Judge Grant held that the issue of potentially incriminating statements to the police was moot because the prosecutor had indicated that he did not intend to use either defendant's statements.  Ex. 2 - Rep. Tr. at 34.  Further, Judge Grant held, "[m]any times there are conflicting defenses. And these people point the finger at the others and whatever, or one has a completely separate defense from the others. But if we allow severance in every one of those cases, we would be severing every single case."  Ex. 2 - Rep. Tr. at 46.  Judge Grant found that there would not be any undue prejudice in trying the cases jointly.  "The mere fact the defendants may have conflicting defense does not convince this court that a severance is warranted in this case."  Ex. 2 - Rep. Tr. at 47.  Judge Grant did grant severance to Irvin on counts five and six, the Jack-in-the-Box robbery.  Ex. 2 - Rep. Tr. at 48.

Petitioner subsequently renewed his motion to sever based upon the opening statement of Irvin's counsel, in which she argued that Irvin was "unknowingly along for the ride."  Ex. 2 - Rep. Tr. at 242.  Judge Grant denied the oral motion, noting his reluctance to make the victim go through two trials and stating that "[t]he preferred procedure is joinder of common charges. . . . The cases anticipate that there will be conflicting defenses among defendants, and most of the cases I have read have indicated that although it can be considered, the Court has discretion. And I refuse to exercise discretion in this case."  Ex. 2 - Rep. Tr. at 244.

Petitioner was convicted on all counts.  On July 19, 1999, Petitioner filed a Motion for a New Trial based in part on the denial of the motion to sever.  Ex. 1 - Clerk Tr. at 664.  On September 30, 1999, after being fully briefed by all parties and hearing oral argument, Judge Grant denied the motion for a new trial.  Ex. 1 - Clerk Tr. at 711.

Petitioner filed a timely appeal.  The California Court of Appeal held that the trial court did not abuse its discretion in denying Petitioner's motion for severance, based on California

**United States District Court**
For the Northern District of California

Supreme Court law holding that joint trials are preferred even where defendants have antagonistic defenses and seek to blame each other.  *See People v. Cummings*, 4 Cal.4th 1233, 1286-87 (1993); *People v. Turner*, 37 Cal.3d 302, 313 (1984).  Ex. 4 at 12.  Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that the defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.  *People v. Morganti*, 43 Cal.App.4th 643, 673-74 (1996) (quoting *People v. Hardy*, 2 Cal.4th 86, 168 (1992) (citations omitted)).  Ex. 4 at 12.

The Court of Appeal considered Petitioner's and Irvin's testimony, and held that their "defenses were conflicting and even antagonistic in some respects."  Ex. 4 at 12.  However, the conflicting defenses were not mutually exclusive, and the "jury was not foreclosed from assessing the guilt or innocence of the co-defendants on an individual basis, and in fact did so, as illustrated by the differing verdicts on count 1."  Ex. 4 at 12-13.  Further, the Court of Appeal held, "there is no reasonable probability that [Petitioner] would have obtained a more favorable verdict at a separate trial."  Ex. 4 at 14.

The Court of Appeal was not persuaded that Irvin's theory of the case necessarily precluded Petitioner from being acquitted, citing *United States v. Mayfield*, 189 F.3d 895, 903-04 (9th Cir. 1999).  Ex. 4 at 13.  Irvin did not present a defense that Petitioner was the only guilty party and, "[a]lthough Irvin's counsel acknowledged her client's participation with [Petitioner] in some of the charged criminal acts committed against Avalos, as the prosecution proposed, the jury was free to disregard this proffered defense theory and accept [Petitioner's] testimony to the contrary."  Ex. 4 at 13.  "The jury was presented with a straightforward choice regarding the credibility and responsibility of the two defendants," and the verdict was a result of the "intrinsic implausibility" of Petitioner's account, not the joint trial.  Further, any potential prejudice from the conflicting defenses was ameliorated by the trial court's instruction to the jury that they should separately consider the evidence presented against each individual defendant, and that argument of counsel was not evidence.  Thus, the California Court of Appeals held that the motion for severance was properly denied.  Ex. 4 at 1.

**United States District Court**
For the Northern District of California

**B.      Analysis**

Petitioner makes two claims regarding the trial court's denial of his motion for severance.  First, Petitioner argues that his right to a fair trial under the due process clause of the Fifth and Fourteenth Amendments was violated.  Second, Petitioner argues that his Sixth Amendment right of confrontation was violated.

**1.      Due Process**

"[W]hen defendants properly have been joined . . . a district court should grant a severance . . . only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.  Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant*." Zafiro v. United States*, 506 U.S. 534, 539 (1993).

The denial of severance of co-defendants or counts may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process.  *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997).  It also may result in the deprivation of the specific constitutional guarantee of the right of confrontation.  *Id.*  A federal court reviewing a state conviction under 28 U.S.C. § 2254 does not concern itself with state law governing severance or joinder.  *Id.*  The Court's inquiry is limited to the petitioner's right to a fair trial under the United States Constitution.

Petitioner contends that being forced to defend himself jointly with a co-defendant whose defense was antagonistic and irreconcilable to his own precluded the jury from accepting his version of the facts or making a reliable judgment about his guilt or innocence.  Pet. at 9-10.  Petitioner argues that the presentation of antagonistic and irreconcilable defenses in a joint trial so profoundly prejudiced his own defense that it was impossible for a jury to give him a fair trial.  Pet. at 10-11.

In order to merit habeas relief, "the petitioner must demonstrate that the state court's joinder or denial of his severance motion resulted in prejudice great enough to render his trial fundamentally unfair." *Grisby*, 130 F.3d at 370.  In addition, the impermissible joinder must have had a substantial and injurious effect or influence in determining the jury's verdict.

13

*Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000).

The Court rejects Petitioner's contention that he was unable to receive a fair trial due to the denial of his motion for severance.  "It is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro*, 506 U.S. at 540.  Petitioner fails to make a particularized showing of prejudice from the denial of severance, instead contending that, in general, when two defendants have antagonistic defenses, the jury will be unable to assess guilt or innocence on an individual and independent basis.  The state court reasonably held that the conviction was based not on the conflict between Petitioner's defense and that of his co-defendant, but on the implausibility of Petitioner's defense and the strength of the evidence arrayed against him.

Furthermore, any potential prejudice that the conflicting defenses might have caused was effectively ameliorated by the trial court's jury instructions.  The jury was instructed to give separate consideration to the evidence presented against each individual defendant, and they were instructed that argument of counsel was not evidence.  Ex. 1 - Ct. Tr. at 518-19.  "[E]ven if there were some risk of prejudice, here it is of the type that can be cured with proper instructions, and juries are presumed to follow their instructions." *Zafiro*, 506 U.S. at 540.  Petitioner was not prejudiced by any error in refusing to sever the trials.

## 2.   Right of Confrontation

Use of an out-of-court confession or inculpatory statement of a co-defendant who did not testify at trial violates the non-confessing defendant's right of cross-examination guaranteed by the Confrontation Clause of the Sixth Amendment.  This violation is not cured by a jury instruction that the confession should be disregarded in determining the non-confessing defendant's guilt or innocence. *Bruton v. United States*, 391 U.S. 123, 134-37 (1968).

Petitioner contends that the arguments of his co-defendant's counsel were analogous to *Bruton* error, because counsel admitted guilt and Petitioner had no opportunity for cross-examination.  Pet. Memo at 23.

This argument is wholly without merit.  As a threshold matter, Petitioner has failed to establish that an extrajudicial confession or inculpatory statement was made by co-defendant and entered into evidence against him at trial. *See Bruton*, 391 U.S. 123 (1968).  Instead,

14

Petitioner contends that the arguments of co-defendant's counsel should be treated as the equivalent of a co-defendant's confession.  However, Petitioner fails to offer any authority for such a claim.  It has long been held that arguments of counsel are not evidence.  *See Weeks v. Angelone*, 528 U.S. 225, 242 n.3 (2000).  The trial court gave a jury instruction reminding the jurors that counsel arguments are not evidence.

The state court's decision was not contrary to, or an unreasonable application of, clearly established federal law, nor did it involve an unreasonable determination of the facts.  Accordingly, Petitioner is not entitled to habeas relief on his claims of constitutional error stemming from the trial court's denial of his motion for severance.

## II.    **Racially Inflammatory Testimony**

Petitioner claims that his due process right to a fair trial under the Fifth and Fourteenth Amendments was violated by the admission of racially inflammatory testimony.  Pet. at 4.

### A.    **Background**

At trial, Petitioner testified on re-direct examination that he and his co-defendant Irvin went to Santa Rosa, ate lunch with his girlfriend, and visited the Santa Rosa Mall and the Coddington Mall.  Ex. 2 - Rep. Tr. at 719-720.  On re-cross examination, the prosecutor elicited testimony that Petitioner had told the police that he and Irvin went to Santa Rosa because Sean [co-defendant] "wanted a girlfriend like [Petitioner] had."  Ex. 2 - Rep. Tr. at 724.  Petitioner's girlfriend was white.  Petitioner and Irvin are both African American.  Petitioner also testified that he told police that Irvin had a white girlfriend and "liked white women."  Ex. 2 - Rep. Tr. at 725.  Moreover, Petitioner testified that he and his co-defendant went to Santa Rosa that day because "[Irvin] wanted to come up there and try to find him a girlfriend up there. Somebody he can hit on, speak to, get at, meet. He wanted to meet a women up there."  Ex. 2 - Rep. Tr. at 723.

Petitioner's counsel made a timely objection on the ground that this evidence was irrelevant, outside the scope of Petitioner's direct testimony, inflammatory and prejudicial, and misstated Petitioner's statements to the police.  Ex. 2 - Rep. Tr. at 732-33.  The trial court ruled that the evidence was relevant "as to motivation."  Ex. 2 - Rep. Tr. at 736.  Furthermore, the

United States District Court

For the Northern District of California

court held that the probative value far outweighed any prejudicial effect.  Ex. 2 - Rep. Tr. at 736.  Finally, the court ruled, "[i]f anyone is raising the race issue, I don't see where it is.  This is testimony.  This is actual evidence that was given by the defendant as to motivation as to why they went up there."  Ex. 2 - Rep. Tr. at 737.  Thus, the court admitted the evidence.

The Court of Appeal held that the probative value of the evidence was not outweighed by the emotional bias or other prejudice it may have evoked against Petitioner, and that the trial court did not abuse its discretion by admitting the evidence.  Ex. 4 at 21-22.

**B.**     **Analysis**

"[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules."  *Marshall v. Lonberger*, 459 U.S. 422, 438 (1983).  The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986), *cert. denied*, 479 U.S. 839 (1986).  Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  *See Henry*, 197 F.3d at 1031; *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).  While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness.  *See id.* (citing *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983), *cert. denied*, 469 U.S. 838 (1984)).

Petitioner argues that admission of irrelevant and inflammatory racial testimony denied him a fair trial under the Fifth and Fourteenth Amendments.  Pet. at 3-4.  According to Petitioner, the testimony in question had no tendency to prove any of the charges or allegations against either defendant, and its prejudicial effect outweighed any probative value.  Pet. Memo at 29-30.  Petitioner contends that this testimony "raised the spector of interracial predation,

black men on the prowl for white women and served no other purpose than to incite racial prejudice among the jurors." Pet. Memo at 30.  Petitioner cites to *United States v. Cabrera*, 222 F.3d 590, 594 (9th Cir. 2000), for the proposition that appeals to racial, ethnic, or religious prejudice during the course of a trial violate a defendant's Fifth Amendment right to a fair trial.

Respondent argues that both the trial court and the appellate court properly decided this evidentiary question.  There was no error in the trial court's discretionary ruling that the testimony was relevant to the question of Petitioner's motivation for going to Santa Rosa.  The appellate court properly held that Petitioner's statement was relevant for two reasons: first, it bore on a possible motive for the kidnapping, and second, it impeached his credibility.  Ex. 4 at 21.  Further, Respondent contends that Petitioner's authorities are distinguishable.  Answer at 20.  In *Cabrera*, a police officer testified about the activities of Cuban drug suspects generally, and in this instance, the prejudicial evidence came directly from the defendants own statements.  Answer at 20.  Respondent cites to the Supreme Court's decision in *Wisconsin v. Mitchell*, 508 U.S. 476 (1993), which holds that a defendant's statements indicating his motive for the crime are admissible against him, even if his words reveal a racial bias.

"[W]e reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  *See Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley*, 784 F.2d at 990.  Only if there are *no* permissible inferences that the jury may draw from the evidence can its admission violate due process.  *See Jammal,* 926 F.2d at 920.

Petitioner has failed to show that the admission of this evidence was so arbitrary or prejudicial that it rendered the trial fundamentally unfair.  The trial court's determination that the Petitioner's statements were more probative than prejudicial was not arbitrary.  The trial court held that the statements went to motive and credibility, and were therefore admissible.

17

This decision was a well-considered and reasonable application of the relevant state law. Further, the decision was not so prejudicial that it rendered the trial fundamentally unfair. The claims of racial animus and bias ring hollow given that the evidence in question was merely a recitation of Petitioner's own words. Testimony about motive is admissible, even if the words reveal a racial bias. *See Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993).

The Court finds that the testimony was properly admitted for the reasons stated by the trial court and the Court of Appeals, and there was no showing by Petitioner that the trial court's discretionary decision was so arbitrary or prejudicial as to violate due process. Accordingly, Petitioner is not entitled to habeas relief on his claim of a Fifth and Fourteenth Amendment violation stemming from the admission of his own "racially prejudicial and inflammatory" statements.

### III.    Impermissibly Suggestive Field Show-Up

Petitioner claims that a field show-up, in which the victim of the Jack-in-the-Box robbery identified Petitioner while he was in police custody on the side of the highway, was impermissibly suggestive and violated his right to due process of law under the Fifth and Fourteenth Amendments. The Court rejects Petitioner's claim.

### A.    Background

About one-half hour after the robbery of the Jack-in-the-Box restaurant, Officer Gray of the Richmond Police Department transported Jack-in-the-Box employee Olivia Morales and a customer by the name of Kim to the Carlson on-ramp of I-80, where Petitioner was being detained, for an in-field show-up. Ex. 2 - Rep. Tr. at 469-70. Prior to arriving at the site, Officer Gray told Morales that they were taking her to see someone "who may or may not be the person who robbed her, and that it was as important to identify who she saw as not a suspect as to identify who actually committed the crime." Ex. 2 - Rep. Tr. at 156. Morales identified Petitioner from about six feet away. Ex. 2 - Rep. Tr. at 153.

Petitioner filed a motion *in limine* to exclude this in-field identification by Morales as impermissibly suggestive and violative of due process. On May 26, 1999, Judge Grant held a

18

hearing on the motion.  Morales testified that she was frightened, and that Officer Gray told her that the person she was going to look at may or may not be the person who robbed her.  Ex. 2 - Rep. Tr. at 152-53.  When they reached the on-ramp, Morales saw the Petitioner handcuffed and standing on the side of the road, surrounded by two or three police cars and two or three officers.  Ex. 2 - Rep. Tr. at 153-54.  Morales identified Petitioner as one of the robbers from about six feet away.  Ex. 2 - Rep. Tr. at 153: 2-12.  At trial, Officer Gray testified that, "[u]pon arrival we were approximately 25 yards away when [Morales] yelled, 'That's him,' pointing to [Petitioner]."  Ex. 2 - Rep. Tr. at 628.

Judge Grant ruled that there was no substantial likelihood of misidentification, holding that, "[h]ere we have a robbery which has just taken place. The person apparently quickly is rushed to the scene where the perpetrator may have been. And she's admonished that the person may or may not be the individual. And she makes an immediate identification."  Ex. 2 - Rep. Tr. at 160.

Morales identified Petitioner several more times.  On June 26, 1998, the day after the robbery, Morales identified Petitioner from a six-person photo line-up as one of the robbers. Ex. 2 - Rep. Tr. at 477-79.  On October 7, 1998, Morales was once again asked to participate in a physical line-up at the police station wherein she identified two individuals, Petitioner and another man.  Ex. 2 - Rep. Tr. at 479-80.  Morales testified that she had difficulty recognizing the Petitioner three months later because his hair was longer.  Ex. 2 - Rep. Tr. at 491.  Finally, Morales identified Petitioner during her testimony at trial.  Ex. 2 - Rep. Tr. at 471.

**B.**   **Analysis**

"A conviction which rests on a mistaken identification is a gross miscarriage of justice." *Stovall v. Denno*, 388 U.S. 293, 297 (1967).  Procedures by which the defendant is identified as the perpetrator therefore must be examined to assess whether they are unduly suggestive.  "It is the likelihood of misidentification which violates a defendant's right to due process."  *Neil v. Biggers*, 409 U.S. 188, 198 (1972).  Due process protects against the admission of evidence deriving from suggestive pretrial identification procedures.  *See Neil*, 409 U.S. at 196.

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Unnecessarily suggestive pretrial identification procedures alone do not require exclusion of in-court identification testimony; reliability is the linchpin in determining the admissibility of identification testimony. *See Manson v. Brathwaite*, 432 U.S. 98, 100-14 (1977).

An identification procedure is impermissibly suggestive when it focuses upon a single individual, thereby increasing the likelihood of misidentification. *See United States v. Bagley*, 772 F.2d 482, 493 (9th Cir. 1985) (holding that repeated showing of picture of individual impermissibly reinforces image in mind of viewer); *see, e.g., United States v. Burdeau*, 168 F.3d 352, 357-58 (9th Cir. 1999) (finding that photo placement, hue and facial expression were insubstantial differences between defendant's photograph and the others in a photographic array, and did not create an impermissible suggestion that defendant was the offender); *United States v. Montgomery*, 150 F.3d 983, 992-93 (9th Cir. 1998) (holding that showing witness photographs of defendant, giving witness own copy of photograph of defendant, and allowing witness to view defendant in courtroom the day before witness testified was suggestive); *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (holding that identification procedures were not unnecessarily suggestive where witness failed to identify defendant from photo spread but later made positive identification at pretrial suppression hearing which defendant voluntarily attended).

Petitioner contends that the field show-up identification was unduly suggestive because he was standing alone, in handcuffs, surrounded by two or three police officers and their squad cars at the time it was made. Pet. Memo at 35. Petitioner cites *Stovall v. Denno*, 388 U.S. 293 (1967), to support his claim that one-to-one confrontations -- "show-ups" -- are inherently suggestive. Pet. Memo at 35-36. Petitioner further alleges that Morales's identification took place at a distance of seventy-five feet and that it was highly unlikely that Morales could have possibly "identified anyone she did not know from that distance." Pet. Memo at 35.

Petitioner argues that because one-to-one show-ups are inherently suggestive, the police should have waited until a later time to perform a proper line-up. Pet. Memo at 35. Moreover, "[g]iven the results of the line-up they did eventually conduct, it is a fair inference that absent

20

United States District Court

For the Northern District of California

the field show-up, Morales might not have identified Petitioner at the [later] line-up as a candidate for the thinner robber."  Pet. Memo at 35.

According to Petitioner, the in-field identification was impermissibly suggestive because the police had already identified a particular person as the guilty party by arresting him. Petitioner argues that this is an instance of *per se* impermissible suggestiveness, and that Morales's identification of Petitioner at trial was tainted by the initial field show-up and should have been excluded.  Pet. Memo at 34-35.

Respondent argues that the California Court of Appeal properly analyzed Petitioner's claim of due process violation under *Manson v. Brathwaite*, 432 U.S. 98, 104-107 (1977).  The Court of Appeal rejected Petitioner's argument for the following reasons:

> The crime had been committed only minutes before, the investigation was proceeding in haste to apprehend the perpetrators before they left the area. An immediate means of seeking identification was essential in the event the witness excluded [Petitioner] as the robber, not only to promptly exonerate him, but also to permit the officers to promptly pursue other suspects. The officers had no opportunity to delay the investigation to assemble a suitable lineup.

> The record is also devoid of any suggestion by the police to the witness that the man in custody had in fact committed the crime under investigation. The officers cautioned Morales "that it might or might not be the person that robbed" her, and advised her of the importance of eliminating a suspect as well as identifying the robber. The fact that [Petitioner] was in custody and surrounded by the police was a product of the time constraints and circumstances of the investigation rather than any deliberate effort to convince the witness of his guilt. Further, Morales made an immediate and assured statement that [Petitioner] was the man who robbed her; she particularly recognized his face. We find no due process violations in the field identification procedure.  Ex. 4 at 18-19.

The admission of identification testimony is a violation of due process only if (1) a pretrial encounter is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, and (2) the identification is not sufficiently reliable to outweigh the corrupting effects of the suggestive procedure.  *See Van Pilon v. Reed*, 799 F.2d 1332, 1338 (9th Cir. 1986).  A reviewing court may assume suggestiveness and review reliability first.  *See id.* at 1339. "To determine whether a challenged identification procedure was unduly suggestive so as to substantially affect the reliability of the identification, a district court reviews the

United States District Court

For the Northern District of California

totality of the circumstances." *Neil v. Biggers*, 409 U.S. 188, 199 (1972).

In determining whether identification testimony is sufficiently reliable under the totality of the circumstances test, courts consider five factors: (1) the witness' opportunity to view the defendant at the time of the incident; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated by the witness at the time of the identification procedure; and (5) the length of time between the incident and the identification. *See Manson*, 432 U.S. at 114; *Neil*, 409 U.S. at 199-200. *See, e.g., United States v. Jones*, 84 F.3d 1206, 1209-10 (9th Cir.) (although drive-by identification by witnesses was suggestive, it was permissible because there was not a substantial likelihood of misidentification), *cert. denied*, 519 U.S. 973 (1996).

The Court finds that under the totality of the circumstances, the in-field show-up was reliable. First, Morales had ample time and opportunity to view Petitioner over an extended period of time during the course of the robbery: Petitioner entered the restaurant, jumped over the counter and put a gun to her head, ordered her to go upstairs, ordered her to open the safe, ordered her to open a second safe, and finally ordered her to go back downstairs. Ex. 2 - Rep. Tr. at 463-467. Second, Morales made her identification within thirty minutes of the robbery. Ex. 2 - Rep. Tr. 471. Third, during the field show-up Morales clearly and unequivocally identified Petitioner, the money bag, and the gun used in the robbery. Upon seeing Petitioner, Morales made an immediate and assured statement that Petitioner was the man who robbed her because she particularly recognized his face. Ex. 2 - Rep. Tr. at 471, 488. Fourth, Morales' initial description to the responding officer at the scene of the robbery was quite detailed, and was reasonably accurate. The Court finds that the in-field show-up identification procedure did not give rise to a "substantial likelihood of irreparable misidentification." The five *Manson* factors all weigh significantly in favor of reliability of the identification by Morales. Accordingly, Petitioner is not entitled to habeas relief on his claim of unduly suggestive identification procedures.

**IV.   Ineffective Assistance of Counsel**

United States District Court

For the Northern District of California

### A.  **Background**

Petitioner asserts that he has a valid Sixth Amendment claim based on trial counsel's failure to call three witnesses.  The first two are witnesses from Santa Rosa whose testimony allegedly would have contradicted the testimony of the complaining witness in the kidnapping case.  Pet. at 4.  The third is Yvonne Johnson, whose testimony allegedly would have contradicted the testimony of the arresting officer in the Jack-in-the-Box robbery.  Pet. at 4. Petitioner further alleges ineffective assistance of counsel based on counsel's failure to investigate and subpoena witnesses to a California Evidence Code § 402 hearing, which resulted in the trial court barring evidence of the complaining witness's prior arrest.  Pet. at 4.

### B.  **Analysis**

The Sixth Amendment right to counsel guarantees not only assistance, but effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  *Id.*  The right to effective assistance counsel applies to the performance of both retained and appointed counsel without distinction.  *See Cuyler v. Sullivan*, 446 U.S. 335, 344-45 (1980).

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.*

The *Strickland* framework for analyzing ineffective assistance of counsel claims is "clearly established Federal law, as determined by the Supreme Court of the United States" for

the purposes of 28 U.S.C. § 2254(d).  *See Williams*, 529 U.S. at 404-08.

It is unnecessary for a federal habeas court considering an ineffective assistance claim to address the prejudice prong of the *Strickland* test if the petitioner cannot even establish deficient performance.  *See Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).

### 1.    Failure to Call Santa Rosa Witnesses

Petitioner argues that he was denied the effective assistance of counsel at trial based in part on his counsel's failure to call two witnesses: Alexandra Patterson, an employee of the Piercing Pagoda at the Santa Rosa Mall, and an unnamed manager of the Big Five sporting goods store at the Coddington Mall.  Pet. at 16.  These witnesses allegedly would have testified that the defendant was at the mall between 12:15 and 1:30 on the day of the kidnapping.  Pet. at 16.  Petitioner contends that this testimony could have been used to impeach the testimony of the complaining witness Michelle Avalos, because she testified that she encountered Petitioner and his co-defendant at around 12:00.  Pet. Memo at 39.

Respondent argues that the testimony of these two witnesses would have been irrelevant because an eyewitness to the kidnapping, Rachel Sullen, testified that the kidnapping occurred at 3:00 p.m., based on the 911 call she made.  Answer at 30.  The decision not to call these two witnesses was a tactical decision by Petitioner's counsel.  *Id*.  Furthermore, attempting to impeach the victim's testimony based on her recollection of the time of her abduction would have been "fruitless to show she was wrong about this minor point."  Answer at 31.  Finally, Respondent argues that Petitioner has failed to provide a declaration from either of these two witnesses to establish what they would have testified to and whether it would have assisted the defense at trial.  Respondent argues that Petitioner's own declaration cannot suffice to prove prejudice under *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2001).  Answer at 30.

The relevant inquiry is not what defense counsel could have done, but rather whether her choices were reasonable.  *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998).  Judicial scrutiny of trial counsel's performance must be highly deferential, and a court must

United States District Court

For the Northern District of California

indulge a strong presumption that trial counsel's conduct falls within the wide range of reasonable professional assistance.  *See Strickland*, 466 U.S. at 689.

The Court finds that Petitioner's counsel's tactical decision not to call the two Santa Rosa witnesses, who may or may not have testified as to the whereabouts of Petitioner some two hours prior to the kidnapping, falls well within the range of reasonableness.  *See Strickland*, 466 U.S. at 688.  Petitioner's attorney Ms. Scanlon had, at the time of trial, been a public defender in Contra Costa County for over seventeen years with a great deal of trial experience. Ex. 3 - Rep. Tr. at 10.  Tactical decisions of trial counsel deserve deference when counsel in fact bases her trial conduct on strategic considerations and the decision appears reasonable under the circumstances.  *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).  Here, trial counsel made a reasonable decision not to call two witnesses who would not have provided an alibi for Petitioner or reasonably impeached the complaining witness, because an eyewitness testified as to the actual time of the kidnapping, and the distraught and highly emotional state of the complaining witness easily explains her confusion as to the exact time of her abduction. Trial counsel's tactical decision not to call these two witnesses is reasonable and falls well within the range of professional standards articulated in *Strickland*.  Accordingly, Petitioner is not entitled to habeas relief on his claim of ineffective assistance of counsel.

### 2.   Failure to Call Yvonne Johnson

Petitioner argues that his trial counsel's failure to call Yvonne Johnson, the driver of the truck that was hit by the black Mustang used in the getaway from the Jack-in-the-Box robbery, constitutes ineffective assistance of counsel.  According to Petitioner, Johnson's testimony could have contradicted the testimony of the arresting officer, Amy Bublak of the Richmond Police Department.  Pet. at 4.  Petitioner argues that Johnson's testimony would have been critical as to two key points in the prosecution's case: (1) lack of flight, and (2) whether the getaway car contained two or three occupants at the time of the crash and subsequent arrest. The result was that Officer Bublak's testimony formed the basis of an instruction that the jury could consider Petitioner's flight as evidence of his consciousness of guilt.  Further, Bublak's

United States District Court

For the Northern District of California

1   testimony could be used as circumstantial evidence that Petitioner was one of the two

2   individuals that robbed the Jack-in-the-Box.  Pet. at 19-20.[3]

3          Respondent argues that trial counsel's decision not to call Johnson as a witness was

4   based upon the fact she "actually supported the victim's story and not [Petitioner's] story."

5   Answer at 30.  Respondent points to the post-conviction *Marsden*[4] hearing on July 21, 1998,

6   wherein Petitioner complained to the court that his counsel had not called certain witnesses at

7   trial.  Ms. Scanlon testified that she made a tactical decision not to call Johnson based on her

8   office's investigation, which concluded that Johnson's testimony "actually supported the victim's

9   story."  Answer at 30.  Moreover, Respondent points out that Petitioner failed to provide any

10  declaration from this witness, nor any corroborating evidence such as the defense investigator's

11  report, relying exclusively on his own declaration for support.  Under *Dows v. Wood*, 211 F.3d

12  at 486, this is inadequate.  Answer at 30.

13         Furthermore, even if counsel's performance is held to be deficient under the *Strickland*

14  standard, Petitioner has failed to meet his burden of affirmatively showing prejudice.  *See Dows*

15  *v. Wood*, 211 F.3d at 486 (petitioner could not show that witness would have presented helpful

16  testimony because he failed to provide affidavit from witness); *Bragg v. Galaza*, 242 F.3d 1082,

17  1088 (9th Cir. 2001) (petitioner failed to identify what witness would have said, thus his claim

18  was wholly speculative); *United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1989) (petitioner

19

20

21         [3] Petitioner asks this Court to take judicial notice of the Order Granting Defendant's Motion
22  to Suppress Evidence in *United States v. Jackson*, No. CR 02-40072 SBA (N.D. Cal. Aug. 7, 2002).
    Docket Nos. 18 & 21 Ex. A.  *Jackson* involved a search of a defendant's house pursuant to a warrant
23  obtained by Officer Bublak's signed affidavit.  The court found Bublak's declaration "dubious" and
    unsupported by objective facts, and found that it contained "tainted -- arguably false -- evidence."
24  Docket No. 20, Request for Judicial Notice Ex. A.
          The request for judicial notice is DENIED.  "[Courts] may take notice of proceedings in
25  other courts, both within and without the federal judicial system, if those proceedings have a direct
    relation to matters at issue."  *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971
26  F.2d 244, 248 (9th Cir.1992).  The Order in *Jackson* is not directly related to the matter at hand.

27

28         [4]*People v. Marsden*, 2 Cal .3d 118 (1970), established the right of a defendant *personally* to
    raise the issue of ineffective assistance by means of a motion to discharge his or her attorney and
    appoint a new one.

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"offers no indication of what these witnesses would have testified to, or how their testimony might have changed the outcome of the hearing").  Answer at 28.

Finally, Respondent argues that this Court may not now obtain such evidence.  *See Nevius v. Sumner*, 852 F.2d 463, 470 (9th Cir. 1988) ("In habeas proceedings, the federal courts are not free to entertain new evidence that places the claim in a significantly different posture, when that evidence was never presented to the state courts.").  Answer at 28.

The Court agrees with Respondent, and rejects Petitioner's claim that counsel's failure to call Yvonne Johnson as a witness constituted ineffective assistance of counsel.  As a threshold matter, Petitioner has failed to provide any corroborating evidence to suggest what this witness may or may not have testified to, other than a self-serving declaration, and hypothetical testimony cannot form the basis of a colorable claim for relief.  Thus, Petitioner has failed to show prejudice.  Further, the Court is persuaded that counsel made a tactical decision not to call Ms. Johnson, which falls well within the range of reasonableness.  Petitioner's counsel testified at the *Marsden* hearing that Johnson was in fact a prosecution witness.  "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."  *See Strickland*, 466 U.S. at 690 (holding that counsel is "strongly presumed" to make decisions in the exercise of professional judgment).  A difference of opinion as to trial tactics does not constitute denial of effective assistance, *see United States v. Mayo*, 646 F.2d 369, 375 (9th Cir.), *cert. denied*, 454 U.S. 1127 (1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available.  *See Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir.), *cert. denied*, 469 U.S. 838 (1984).  The record simply does not support Petitioner's contention that he received ineffective assistance of counsel.  To the contrary, the record indicates that Petitioner's counsel vigorously pursued the motion for severance throughout the proceedings, made timely objections, and argued against admission of the in-field identification by witness Morales which resulted in a separate evidentiary hearing.

Accordingly, the Court finds that Petitioner is not entitled to habeas relief on his Sixth

27

United States District Court

For the Northern District of California

1   Amendment claim of ineffective assistance of counsel based on trial counsel's failure to call Ms.

2   Johnson.

3          **3.      Failure to investigate or call witnesses for California Evidence Code**

4                  **§ 402 Hearing**

5          Petitioner further contends that he received ineffective assistance of counsel at the

6   evidentiary hearing on the questions of whether Ms. Morales had been charged with a

7   misdemeanor (making terrorist threats to her mother) and whether this evidence could be

8   introduced to impeach Ms. Morales.  Pet. at 18.  Petitioner alleges that trial counsel failed to

9   investigate or subpoena witnesses in support of his motion to admit this evidence.  Specifically,

10  Petitioner alleges that counsel failed to (1) interview the officer who wrote the arrest report, (2)

11  check the protective order file for statements made by Ms. Morales' mother and sister in support

12  of their request for a protective order, and (3) subpoena the arresting officer and/or Ms.

13  Morales' mother or sister for the § 402 hearing.  Pet. at 18.

14

15         Respondent contends that there is no reason to believe that Morales' mother or sister

16  would have testified differently from their written statements contained within the police

17  reports.  Answer at 28.  Moreover, Respondent argues that Petitioner has failed to produce any

18  evidence, such as a copy of the protective order or a declaration by the investigating officer or

19  any of Avalos's relatives stating what they would have testified to at the hearing.  Thus,

20  Petitioner has failed to met his burden of affirmatively showing prejudice.  *See Dows v. Wood*,

21  211 F.3d at 486 (petitioner could not show that witness would have presented helpful testimony

22  because he failed to provide affidavit from witness).  Answer at 28.  Finally, Respondent argues

23  that "any attempt to obtain such evidence now would render the claim unexhausted."  *See*

24  *Nevius v. Sumner*, 852 F.2d at 470.  Answer at 28.

25         "[S]trategic choices made after thorough investigation of law and facts relevant to

26  plausible options are virtually unchallengeable; and strategic choices made after less than

27  complete investigation are reasonable precisely to the extent that reasonable professional

28  judgments support the limitations on investigation. In other words, counsel has a duty to make

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins v. Smith*, 539 U.S. 510, 521-522 (2003).

The threshold question is whether his counsel's investigation prior to the evidentiary hearing was reasonable. Petitioner acknowledges that his counsel did investigate in preparation for the hearing, but contends that the investigation was insufficient. Petitioner's investigator called the alleged victim's house to get a statement, and uncovered the existence of a protective order involving the witness and her mother and sister. Pet. at 18. "In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made, and by giving a heavy measure of deference to counsel's judgments.'" *Rompilla v. Beard*, 545 U.S. 374 (2005) (citation omitted). Giving great deference to counsel's judgment at the time, and being cognizant of the fact she did the necessary investigation in preparation for this hearing, Petitioner failed to establish that the investigation was unreasonable.

Therefore, this Court holds that Petitioner has failed to establish ineffective assistance by his trial counsel. His claims of ineffectiveness are based solely on speculation and hypothesis. A defendant's mere speculation that a witness might have given helpful information if interviewed is not enough to establish ineffective assistance. *See Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001). Further, the duty to investigate and prepare a defense does not require that every conceivable witness be interviewed. *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995).

Even if trial counsel's tactical decision not to call the victim's mother or sister to testify against her in a hearing constituted ineffective assistance of counsel, Petitioner has failed to make the requisite showing of prejudice. "The Petitioner must show that trial counsel's alleged errors were so serious as to deprive the defendant of a fair trial." *Strickland*, 466 U.S. at 688. The test for prejudice is not outcome-determinative: defendant need not show that the deficient conduct more likely than not altered the outcome of the case; however, a simple showing that the defense was impaired is also not sufficient. *Id.* at 693. The defendant must show that there

29

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different; a reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 694.

Trial counsel's failure to subpoena certain witnesses or more thoroughly investigate Avalos' arrests did not prejudice Petitioner or render the trial fundamentally unfair. To establish prejudice caused by the failure to call a witness, a petitioner must show that the witness was likely to have been available to testify, that the witness would have given the proffered testimony, and that the witnesses' testimony created a reasonable probability that the jury would have reached a verdict more favorable to the petitioner. *Alcala v. Woodford*, 334 F.3d 862, 872-73 (9th Cir. 2003). Petitioner has not established any of these elements. At most, a favorable ruling at the § 402 hearing would have allowed Petitioner's counsel to ask Avalos on cross-examination about the events that led up to her being charged with making terrorist threats. Given the overall strength of the state's case against Petitioner, there is no reasonable possibility that such questioning would have led to a different result in the proceeding. Accordingly, Petitioner is not entitled to habeas relief on his claim of ineffective assistance of counsel.

## V.    <u>Cumulative Error</u>

Petitioner alleges that the cumulative effect of all the aforementioned errors deprived him of due process of law as guaranteed in the Fifth and Fourteenth Amendments. (Pet. at 4).

In some cases, although no single error is sufficiently prejudicial to warrant reversal of a conviction, the cumulative effect of multiple errors may result in prejudice sufficient to overturn a conviction. *See United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996). Cumulative error is more likely to be prejudicial when the government's case is weak. *Id.* If there is no violation of the defendant's Federal rights, there is no reason to reverse for cumulative error. *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996).

The Court has held that there were no violations of Petitioner's Federal rights. Further, the state's case against Petitioner was strong. Petitioner's own testimony established that he was

at both crime scenes, and at the scene of the crash of the robbery getaway car.  At least two eyewitnesses identified Petitioner as the person who committed the crimes: the victim of the carjacking and kidnapping and the robbery victim.  Thus, the Court finds that even if there were errors, the cumulative prejudice is not sufficient to overturn Petitioner's conviction.

### **CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The Clerk of the Court shall enter judgment and close the file.

IT IS SO ORDERED.


DATED: 10/6/06                              _Saundra B Armstrong_
                                           SAUNDRA BROWN ARMSTRONG
                                           United States District Judge

United States District Court
For the Northern District of California

31